Good morning, gentlemen, and Mr Johnson, you're ready. We have three issues to present to the court today, two issues involving classification of property prior to distribution in the judgment, and one issue concerning a grant of a motion for summary judgment in regard to the issue of my client's claim for maintenance. The first issue in regard to the $153,000 of accounts receivable that were held in Ms. Cozzi's medical practice, the trial court, despite a post-trial motion, implicitly but not explicitly awarded these funds to Ms. Cozzi. But, Mr. Johnson, what in the record indicates that they were not considered when the court, the trial court, considered the value or the award of the actual practice? What is there in the record that says they were not considered? There was no evidence whatsoever as far as what the valuation of the actual practice was. The actual practice was always considered to be non-marital property. All right. Then why is this different? It's different, Your Honor, because of the case of Schroeder, the Illinois Supreme Court case that identified what accounts receivable are. It's different because of cases like in re-marriage of Schmidt and in re-marriage of Heinze, which we cited in our brief, where there was a situation where one of the parties had earned money and by writing books it hadn't been collected yet, and the Heinze court ruled that, yes, that was marital property. Wasn't that future royalties, though? But it was royalties earned during and prior to the entry of the judgment of dissolution of marriage. The books were written before. Absolutely. But the royalties weren't really set yet, correct? I mean, the royalties are something that may come in in the future, correct? No. I believe they were determined. The only question was whether or not they were going to be classified as marital or non-marital property. But that, they were, the accounts receivable or the royalties were a separate entity. There was no actual business that was involved in, he didn't have, you know, Heinze Books Incorporated, and this was part of it. These were separate funds related to the writing of the books, but no company related to the writing of the books, correct? I understand that, Your Honor. And in that regard, I'd point out to the Court that when these types of funds are earned and they're determined to be as a result of personal efforts, I would indicate to the Court that there becomes a presumption of personal effort. In the case of, the Dan case that was decided here, footnote 11, when they were discussing the decision in in-ray marriage of Schmidt, the Court here indicated that, though we did not mention it in our actual analysis, Kim held a minority interest in Colonial. Evidently, we did not believe this was enough to overcome the presumption of personal effort. Here, regardless of the actual valuation of the medical practice, whether it was marital or non-marital, the point is, is that Ms. Cozy was the only person in this practice that it was a presumption that this is marital property. In the old case that was cited by Dan, an old Kane County case called in-ray marriage of Phillips, this Court ruled that remuneration to a spouse in whatever form during the marriage is presumed to be marital. And because it's presumed to be marital, and because Ms. Cozy had the allegation and the burden to overcome that presumption by clear and convincing evidence, she never offered any. Was it the salary enough? The salary she took, wasn't that fair compensation that would then overcome it? Your Honor, that may be a question later for distribution, but not for classification. It does not bear on the classification question, because under Romano and also Schmidt, and going back as far as the Hankey case, before a court gets to issues of distribution, the property has to be properly classified. In this situation, this accounts receivable was failed to be determined to be marital property, and it was against the manifest way of the evidence not to circumvent the claim. Why are we looking at this as getting on to basically almost the same question that Justice Hutchinson asked, but why are we looking at this as two separate entities? We're looking at the practice as a non-marital asset and then the accounts receivable as a separate marital asset. Here's why, Your Honor. We end up in a situation where a person has a non-marital entity, a business. All they would have to do in that situation is to take all their earnings that were obtained by their own personal efforts, which are presumptively marital, put them in the non-marital business in order to escape any sharing in the marital estate of that asset. But they're not going to escape because under 503C2B, there could be a contribution, a reimbursement to the marital estate from that. I understand, Your Honor, but there was never any showing or any argument on the part of Ms. Posey as to what she was entitled to be reimbursed for. Well, wait a minute. You're not contesting that the marital, that the medical practice was non-marital. I am not. So if we, let's just play devil's advocate for a minute here. If we were to look at the accounts receivable as just a part of that, as an increase in the value of that asset and not a separate entity unto itself, why would she have to prove anything? She's already, you're not contesting that this is non-marital if that, again, if that is seen as part of that asset. If that is the theory that's proposed, I agree with you, Your Honor. However, the problem is, is that by doing that, it throws away the presumption of marital property when it's obtained by a single person. Well, it's already thrown away by the prenup here. This is her practice. It is her. She's built it. She's going to continue to build it. And he agreed to that. It is her practice. And then later, he signed another agreement when the house was purchased, indicating that he was going to make contributions that he never made. I mean, he has done nothing to fulfill his end of the agreement. She has been working, keeping a place for them to live, keeping him in food, keeping him in transportation money. Why is it separate from her business? It's separate from her business because it represents her income. And under the law and under the statutes and all the presumptions that I've been able to have to be classified as marital property. But that's an entirely different question from distribution. And that's why we take the position that the $153,000 has to be classified as marital property because if it isn't, the easy sidestep around the entire presumption legislative scheme of marital property being property acquired by either spouse during marriage, all a person would have to do is say, guess what? This was obtained by my non-marital company, so guess what? It's not. Well, then the party who has to have this separated from his business now pursues, brings it and actually pursues a dissipation claim against the other party, and there's nothing to distribute. I don't know if that would occur here or not, Your Honor. How could it not? He didn't do anything. He said he would do nothing. This situation was handled exactly the way I talked about earlier, which is whether it's where the court basically decided that the accounts receivable of a non-marital business were an increase in the value of that asset, and that you then look at this, whether or not contrary reimbursement is appropriate. And if that's the case, then the burden would be on you to show reimbursement. I understand, Your Honor. But in this particular case, there was never any proof offered as to what the value of this medical practice was by Ms. Kelsey. We have no idea what it was worth. But if you're seeking reimbursement, you have to show that. I'm not seeking reimbursement. You're seeking to have it classified as a marital asset and, again, separate it from the business, and I think we just keep going around and around the same block here. And I understand. If it's a marital asset and the trial court was wrong to declare non-marital, then it would go to the top of the marital estate. I just simply ask the court to keep in mind its decision in in-ring marriage of Dan at paragraph 86, when he cited in-ring marriage of Phillips at 229.0F3809, remuneration to a spouse in whatever form during the marriage is considered marital property. Respectfully, I think that's the law, and I think that this issue has to be reversed on the classification question. Also, next on the issue of the purchase of 6 Shelburne, because your letters under Section 503C1B, this was newly acquired property, the residence at 6 Shelburne. When we look at the request to admit that she filed, and his response to that, which I believe was that he didn't have sufficient knowledge to form a belief as to the truth or falsity of that, did that response constitute an admission? I don't believe so, Your Honor. Why is that? Because clearly, first of all, 6 Shelburne was property acquired during the marriage. Even if it was, though, a request to admit, if it's admitted, would be controlling, wouldn't it? It depends on what the request was. I mean, the property was newly acquired property. Under the statutory scheme at 5031B, when marital and non-marital property are commingled into newly acquired property that results in a loss of identity of the contributing estate, the commingled property shall be deemed transmuted to marital property. And if the request to admit, though, was that the funds for the purchase of the Shelburne and the Oakbrook home came solely from the sale proceeds of the Chicago home, and if, first of all, was it admitted by that response, second of all, if it was admitted, would that be controlling of this issue? I don't think it was admitted. If it was admitted, I suppose it would be controlling, except for the fact that even in D'Apoli's brief, they say, let's assume for a moment that there was $25,000 of marital funds that were added to the purchase price. It seems to me that that contradicts even D'Apoli's position. So the third question then is, if there was $25,000 contributed, would that be enough to transmute that property? Oh, absolutely. Because it was newly acquired, and the identities of the property, of the contributing estates were lost, and the statute has to be upheld. That's why it should be classified as marital property. And what exactly were Mr. Rapp's contributions that would confuse who paid what to whom, or what went where? I mean, there has to be a loss of identity. What did he contribute so that there could be a loss of identity? At this point, Your Honor, this is an issue. It's a serious issue raised in this entire case. What are his contributions based upon his agreements? Your Honor, I think that simply by being married, he's entitled to, if this is marital property, and if one spouse contributes everything, it doesn't matter under the... Well, it does under his agreement that was signed just before Shelburne was closed, that he was going to contribute 50% of this, that, and the other thing, and 100% of the taxes. There is no evidence that he contributed a penny. I understand, Your Honor, but I don't think that that was the legal basis upon which Shelburne should have been classified. It may have been a question for contribution, but certainly not classification. Was the Chicago home non-marital property? It was. And was the Shelburne home, if we assume there was an admission that the entirety of the purchase price was paid for by the sale from the sale of the Chicago home, why would that not be under 503A2, property acquired in exchange for property acquired before the marriage? Because there has to be a tracing under the Didier case and under the Schmidt case of dollar for dollar that all of the amount was enough to purchase the Shelburne home. And that's where we get to the admission. I mean, if the admission, the request, I mean, the trial court relied on this request to admit in response to the request to admit as an admission, correct? Your Honor, but I don't think that the admission goes to all of the necessary funds to buy Shelburne. I think as of the record, there weren't enough funds to buy Shelburne, and that's why we maintain that there had to be a commingling under 503. Well, number 11 says the funds for the purchase of 6 Shelburne came solely from the sale of the proceeds of the Chicago condo. And that's what the request was. And if we deem that admitted, then the funds for the purchase of Oakbrook House came solely from the proceeds from LaSalle Street. I mean, again, if it's needed to admit. Your Honor, I just don't believe it was. And on top of that, I believe that there was of record testimony that if it required additional money, there had to be a mortgage obtained. So I think that is just simply incorrect. I know my time has expired, Your Honor. I didn't get to the summary judgment question, but we'd ask for a reversal on all three issues. Mr. Simarco? Anthony Simarco of the Stocksville Law Firm on behalf of Laura Posey. I would just like to maybe clarify the difference between accounts receivable and retained earnings, because it seems that the trial court may have had some questions about that. And Mr. Johnson's argument seems to me to equate accounts receivable with available cash. And there being only one shareholder to the company, there would be no reason why that one shareholder wouldn't be able to distribute those accounts receivable as cash. That's where I think the biggest confusion is. So we know that retained earnings is the profit of the company, which remains undistributed to shareholders. It sits in the company. If you have one shareholder, that shareholder can go ahead and write the check, and it's income. Accounts receivable represents services which have been provided but not yet paid. How is that different from the future royalties in Heinz? The future royalties in Heinz, you have the effort done during the marriage. Subsequent to the entry of the judgment, you receive compensation for those royalties. If you don't pay, if you want the book, you have to pay the money. The money's there. It's paid. Accounts receivable means if Dr. Cozy does some services and bills the patient, there's potential for that patient not to pay. That goes in the accounts receivable bin. And there's a potential that she will never be paid for the services that she has rendered. Now, some accounts receivable, let's suppose that I subscribe to being able to use MasterCard. All my patients come in. They give me a MasterCard. I bill MasterCard. I receive the funds from MasterCard. But it takes maybe 30 days or 60 days to get those funds from MasterCard. And then MasterCard goes over to the patient and says, We just paid Dr. Cozy by use of your card. Now you owe MasterCard the money. So those accounts receivable usually convert to cash within 30 days or 45 days. So those issues are very confusing. And I think if the ultimate bill is being paid by the state of Illinois, it's going to be in accounts receivable for a long time, but eventually it will be paid. I mean, it could be, if you look at my explanation of benefits, it could be a year later. But still, Bill, the point is it is going to be paid. And it is for services rendered during the time that they were married, right? That's true. But there are some creditors whose potential for payment are higher than other patients. Of course. Of course. Dr. Cozy, I think, testified that she doesn't even know the age of many of these. So I think she needs a new accountant, first of all. But secondly, not knowing the age, some of them could have been before they were married, but then they're sitting there for no good reason. So that particular testimony was a little bit incredible, that she's holding things from when she started her practice way back when, whenever that was. So, I mean, you can understand that there's some confusion about what she's actually doing as well, correct? Yes, Your Honor. Absolutely. And she's not an accountant. She's a doctor. I get that. But she's hired somebody to do it. But what about the fact that this is just part of her business? Because he said it was a non-marital asset, he agreed it was a non-marital asset in that prenup. He doesn't have to value it. She doesn't have to value it. It's just part of that business. It is part of the non-marital entity. The part of the non-marital entity counts receivable pursuant to Schneider is a function of the valuation of that company. What is the potential for collection, dollar for dollar, penny for penny, on those accounts receivable factors into the value of the company? You're correct, Judge. Well, this, you know, potential for collection, we seem to be kind of dancing around the issue of burden of proof. You know, opposing counsel seems to think that, or argues that you have the burden of proof because this is presumptively a marital asset because it was earned during the marriage. Do you agree with that? I don't agree that the accounts receivable is a separate stand-alone asset. It is part of the non-marital practice. We learned that from Schneider, the Supreme Court case. Schneider dealt a lot with goodwill, personal goodwill, enterprise goodwill, but it also addressed what do we do with this animal called accounts receivable. It's a function for valuation. Is the income from the practice, during the time that they were married, is the income from the practice marital property? Absolutely, Judge, it is. So why wouldn't then income that is owed and may be paid at some point in time, why wouldn't that be marital property? Well, I guess the first reason is there's no probability, there's no definite percentage factor of how much of that accounts receivable is ever going to be realized as cash. And that's why it's a function only of valuation. It's not a function of income. Retained earnings, undistributed profits, that's cash. This is not retained earnings. It's a different category. May I just address something else, Justice Spence, when you say that? Mr. Johnson referenced an argument about what about Dr. Cozy's salary that remains in the company? And that was the first thing out of my mind. Those are retained earnings. Those are not accounts receivable. So if we had these retained earnings and Dr. Cozy had taken $25,000 a year in income as opposed to $150,000 in income and she stocked away those retained earnings in the company to simply avoid distribution to the spouse in a divorce situation, then the analysis would be was her salary reasonable for a doctor running that practice in the same geographical community? If it was, then the retained earnings doesn't get distributed. If it wasn't, maybe the retained earnings is a separate marital asset. Is it actually viewed as a separate marital asset or is there reimbursement to the marital estate? Because that's a difference. We're talking about purposefully underpaying oneself and therefore accumulating cash in the non-marital entity. Which increases the value of that entity through the efforts of the spouse. Remember that section I cited to see whatever it is, that then the marital estate can seek reimbursement. Yes. That's the evidence. Absolutely. Absolutely. The second issue I would like to address is the non-marital versus marital character of the Shelbourne property. I think both of the parties have testified that Dr. Cozy owned the LaSalle Street, Chicago property prior to the marriage. 1994 to 2000, she retired the mortgage balance on the LaSalle Street property. She then took the sale proceeds from the LaSalle Street property and purchased the Oakbrook property, the Shelbourne property. So my reliance and my analysis, I do agree with Justice Burke where he indicated that a different section of 503, actually 503A stands for the proposition that when we have a non-marital entity acquired prior to the marriage and it's exchanged for an asset during the marriage, it retains its non-marital character. Does that still apply if $25,000 in marital funds was used for part of the down payment? Okay. So when we have a non-marital asset, which is the sale proceeds of LaSalle Street, and we have $25,000 of marital property, we put those two together and it purchases the Shelbourne property. The Shelbourne property is still non-marital. Now we ask, well, why is it non-marital? The equation is non-marital plus $25,000 equals non-marital. That's my equation. Mr. Johnson's equation is take the exchange of the non-marital property, add $25,000 to it in marital property, and it becomes marital. Well, Justice Burke was correct. He referred Mr. Johnson to paragraph 503C. If the contributed property, the $25,000, loses its identity, you can't find it after the transaction because it then, for lack of a better word, it morphs into the Shelbourne property. The contributed property transmutes to the estate receiving the property. So the non-marital, excuse me, the marital $25,000 transmutes to the exchange of non-marital property. And then the burden, subject to the provisions of paragraph 2 of subsection C, when one estate makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution, notwithstanding any transmutation. So I take that section to read that the burden of proof was on Mr. Reff during the trial to extract that contribution from the marital estate to her non-marital estate. Well, he did testify that an additional $25,000 had to be used, and that would have been marital property. What more does he have to do? He did. He did testify to that. But section C, 503C, 2A indicates that the tracing has to be by clear and convincing evidence. He said it was about $25,000. There was no receipt. There was no closing statement. There was no check. I don't think either of the parties would have ever been in a situation during the trial to trace. How much was it really? Was it $17,500? Was it $25,000? I don't think either of them was prepared to give evidence on that number. Mr. Johnson says by virtue of your brief, you have admitted that there was an additional $25,000. Do you agree with him? I admitted that that was the testimony of the parties, but I did not concede the fact, nor do I concede the fact today before the Court, that the tracing had occurred by clear and convincing evidence. And then what about the request to admit? What, if any, part does it play in this particular decision? Well, as Justice Burke pointed out to Mr. Johnson, that fact was admitted that all of the sale proceeds from the South Street property went into the purchase of Sheldon. By virtue of not having enough information to either admit or deny? Yes, ma'am. Okay. Let me talk about the maintenance issue a little bit. Did the trial court rely solely on that counterfeit? Your Honor, I believe that the trial court did rely in large part on what Mr. Reb had indicated in his response to the request to admit. And I think it was somewhat confusing and maybe purposefully confusing, because he says, quote, without admitting the admissibility of the purported agreement in question, the attachment purports to be a true and accurate copy of a document titled by a petitioner as attachment A. So I think the choices that Mr. Reb had were two. He had two choices. The first choice, he could have filed an objection to the request to admit or deny, or he could have denied it. But this characterization of what that agreement was. Let's assume it's admitted. Let's just look at that contract. I mean, is that a contract saying I am presently involved in a conjugal continuing relationship? I mean, because he may offer proof at trial that I know I signed the contract, but I was never planning on going through with it. It was a contract to do something in the future, and it really didn't establish at the time a continuing conjugal relationship. I think it calls for more of a ringmaster than an attorney, but I'll do my best. When I look at that contract, many things come to mind. Is it an antinatural agreement with Ms. Yen, number one? I think it is. Is it a marriage contract, which in Vietnam is perhaps the way things are done there, and it creates a legally enforced document, a marriage, if you will. Another way I look at it is when I take a look at Justice Jorgensen's opinion in Miller, and I say to myself, well, if it isn't a legal marriage, if there is no solemnization, if there is no governmental authority saying, yes, I pronounce you husband and wife, I look at that agreement and I say, is that enough to create a de facto marriage relationship? So I have a lot of confusion as to what that agreement is and what it means and how it operates. So unfortunately, after I did the brief, I thought of some other things. Proceed, please. If we have a big in this marriage. What about in your or in the motion for summary judgment, there is a reference to the 504 factors. You say, according to 504, the court should consider this. Then you go, the next paragraph is 510C. And then from there on, nobody talks about 504 anymore. It's all 510C. Why was there an emphasis on 510C? And why was there the wrong language used? It is resident continuing conjugal relationship, not just continuing conjugal relationship. The resident needs something in this case. So the first question here is, what happened to 504C in this mix? I agree, Your Honor. Or 504, pardon me. I agree, Your Honor, but if we take a look at 504 and 510C side by side, we see that many of those factors are contained in both sections. Well, but there are some in 504 that don't sit in 510C. The primary ones being ability to earn, the retirement type issue, and lifestyle during the marriage. Those three really are not 510C factors. And it doesn't look like anybody considered those. I look at 510C as a mechanism for the termination of maintenance once ordered. It's a modification of maintenance. Where was maintenance ordered here other than on a temporary basis? Well, there was $150,000 rolled off of something that Mr. Rev got that I think the record reflects was somebody was tired of constant motions for maintenance, so they just, let's take this $150,000 and hopefully that will solve the problem. But do we consider temporary maintenance in this mixture when we're talking about termination, revocation, and modification? I don't think that was the intention of the legislature, Your Honor. Okay. So why does everybody jump to Miller when Miller is clearly a modification or termination of post-divorce maintenance? Well, how does it have application here? Well, because I think if the court and the legislature is willing to impose a mechanism for termination of maintenance, i.e., cohabitation or a de facto marriage, it would stand to reason that if you're already in a de facto marriage prior to the time you're divorced, it would bar you from the receipt of maintenance. Even if it ends? Even if it ends. So if you're in it, you know, you're in it for a month, you live with someone for a month, it ends and you don't go through to your divorce trial for two years, you still don't get it because of what you did two years ago? Yes, Your Honor. Well, what happens if there's a reconciliation that's different? I'm sorry, Your Honor? If there is a reconciliation after that month, when you come back and everybody's fine, well, that's Toole. I mean, that's the matter of the marriage of Toole, where that's clearly stated. If there is a reconciliation, the month is forgotten. But it doesn't – It's been a while since I've read Toole, Your Honor, but I don't want to disagree with the court not having had an opportunity to read it, but I've always viewed the events of 510 as once they happen, you can't repair them. So if there is a cohabitational relationship subsequent to the award of maintenance, and it's proven by a preponderance of the evidence, the recipient of maintenance will no longer receive maintenance, regardless of the reconciliation, regardless of whatever else happens. And that could lead – if that were the case, that could lead to some serious misuse of – it could be deceitful, you know, to say, okay, go ahead, it's an open marriage, let you do that, I'll do this. It won't bother us when we come to maintenance. Well, then it would bother us when we came to maintenance. Exactly. At least as a matter of law. There could also be other issues that we're not contemplating here because we don't have to, but it just seems to me that the legislature set a course, and we are in pre-divorce proceedings, and so we have to determine eligibility for maintenance, not whether it should be terminated or modified. So the question I think the court has for me today is when we're at the trial level and there has been no determination of maintenance, who bears that burden of proof, i.e., am I eligible for the receipt of maintenance? And if I am cohabiting, who has the burden of proof of telling the court, based on that cohabitation, the person seeking maintenance is barred, is ineligible for maintenance? Okay, and your answer to this question? The answer to the question is I don't know the answer to that question, but I think once the court receives evidence of cohabitation, it can't ignore it because we're not in a 5-10 situation, because we're not in a modification situation. But what if it happened twice? It wasn't even continuing conjugal. I don't know what continuing means. I do know what conjugal means, and I think I know what resident means. So we've got to put those three terms together. How do we get there? I think we get there by a really thorough and careful reading of Miller when Judge Jorgensen basically tells us that marriages, in a sense, are like snowflakes. No two marriages are alike. So in Miller, we see that the parties post decree need not even be living in the same household to be cohabiting. And Judge Jorgensen makes the analogy and says that there are many marriages which go on for years and years where they are without intimacies, they are without one common dwelling, they are without the sharing of a common bank account, they are without sending joint Christmas cards out every year, but nevertheless, those qualify as marriages. Because they are legally solemnized. That's correct, Your Honor. But Dr. Cozy isn't under the burden of proving that Mr. Rev is married, only that he participates in a de facto marriage, a relationship stronger than a commitment and maybe but for a solemnization. This qualifies as a marriage, which would disqualify him from maintenance. How did this relationship commitment agreement come to light? Because if you read it closely, there's a pretty big penalty for that happening, like $50,000, I think. I'm not understanding the question. Well, how did we find out about it? What was the impetus for Dr. Rev and his... How did Dr. Rev, I'm sorry, Dr. Cozy find out that there was this agreement? My understanding is that searching around her own residence for compilation of materials for discovery, it turned up. Okay. It was not tendered by Mr. Rev in the process of discovery. And that's what might have fueled the subsequent document saying, we're not going to communicate this way anymore. Okay. So when I look to that document, we see taking real actions to achieve a wedding and a legal marriage and to raise a family. Well, the problem, I think the real problem is that I think in Vietnam, you can't get married until 24 months after you're divorced someplace else. So this may be some of the impetus for this. Like if you get divorced here, you have to wait a time up in Wisconsin before you can get remarried. It's a lot closer. The agreement is what the agreement is, and I think we've all had a chance to read it. So if you want to wrap up, we'll let Mr. Johnson have his last shot. Okay, Your Honor. Thank you. I think that the agreement not only stresses a current commitment, expresses wedding vows, employs the words honesty. It puts restrictions on Mr. Rev from having marital intimacies with Dr. Cozy, names her by name, says we want to take real actions to achieve a wedding and permanence and to enter into a legal marriage. All of those factors support that they intend this relationship to be a permanent and long-lasting relationship as if a marriage. These are the factors that Judge Jorgensen spoke about in Miller. There's also a financial element, joint properties and financial accounts. It makes reference to that. So I think when we look at that agreement as a whole, it may be short of an actual document which memorializes a legal marriage. But maintenance and qualification for maintenance doesn't require a legal marriage. All it requires is a de facto marriage. And I think that this document certainly, at a minimum, establishes a de facto marriage. Thank you very much. Thank you, Counsel. Mr. Johnson. I'll be very brief, Your Honor. First of all, in talking about the 6 Shelburne property, counsel carefully avoids these words of the statute. If marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property. Certainly, it's subject to reimbursement or whatever it is later. But it's classified as marital property. So if a house costs $100,000 and someone contributes $99,999 and someone contributes a dollar, that's a marital property? I think the law is clear. Is it? I believe it is. How about $0.50? Pardon me, Your Honor? $0.50, quarter, nickel, penny? Your Honor, the legislature... Okay, so let's say it's a penny. You're saying if I contribute a penny, that the whole thing is transmuted? I think so. If the legislature wanted to make it differently, then the legislature needs to make it differently. But this says what it says. Wasn't that the impetus of changing the law back in, I don't even know what year it was, but changing some of the statutes because of the harsh effect of transmutation? But those were situations where it was already existing property, like there was a condominium, and the condominium was worth $100,000 or $75,000, and they put $3,500 into it for renovations. And the Supreme Court in that case, I can't recall the year, but immediately, but they said, oh, that makes, it's marital property. But what they didn't do, or what they did do then, is they separated property that's already in existence between the parties and talking about newly acquired property during the marriage. That's the difference. And that's why that changing statute really doesn't apply because Shelburne was newly acquired property. And when that happens, those assets have to be traced, and they have to be traced by the party who is trying to overcome the presumption that it's marital property. So I believe the counsel has misapplied the statute and has ignored 503C1B. Lastly, on the issue of, or next on the issue of the summary judgment, I think we only get to where Your Honor, Justice Hutchinson mentioned, to properly following the statute is by a full evidentiary hearing, not by shortening these things up with a summary judgment hearing on a document. In fact, as the Court mentioned, my client testified that he was told that he wasn't in the United States, and here he can be killed, and there was no forensics. And that he had no interest in fulfilling the terms of this so-called agreement. He was in a different country. Then why did he go back in 2014? Because he still had remnants of a business there, Your Honor. Oh, he was earning money? I thought the business went down between 2010 and 2012. So he's still going back in 2014 and sending money, you know, after the business allegedly fails. So what's he going back for? All I can say is that he had certain obligations. He felt he had certain obligations over there, at least, to see if the people were still operating it. But then again, it's an issue that should be tried at trial, not through a document. And all I can say about this issue concerning the accounts receivable, when you have a single shareholder who can pull all the strings and make all the calls, in that situation, whether you want to call it retained earnings or you want to call it accounts receivable, we know it's an asset. It's marital property. It follows Phillips. It is remuneration in whatever form to a spouse during marriage is regarded as marital property. On that basis, I would ask the Court to grant relief on all the issues we've raised. Thank you, Your Honor. Thank you, counsel, for your arguments. We will take the matter under advisement and issue a decision in due course. Thank you.